### THE DIAMOND CEMENT.

### PARTOS v. PACIFIC COAST S. S. CO.

No. 8467.

Circuit Court of Appeals, Ninth Circuit.
March 2, 1938.
Rehearing Denied April 4, 1938.

Grosscup, Morrow & Ambler and Owen P. Hughes, all of Seattle, Wash., for appellant.

Stratton, Leader, Little & Stratton, of Seattle, Wash., for appellees.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree on a libel for damages for injury to the sailor libelant claimed to be due to the unseaworthiness of the vessel on which he was employed and, in any event, for his maintenance and cure.

Motion was made to dismiss the appeal on the ground that the record does not show a petition and allowance by the District Court of an appeal.

The record in this case shows no formal petition for or allowance of appeal, but such petition and allowance may be inferred from the evidence of the acts of the lower court and counsel with reference to matters occurring subsequent to such petition and allowance. In the following cases the petition and allowance of the appeal were proved by showing the action of the court in approving of a bond on appeal or in the approval of the bond and the signing of the citation. Sage v. Central Railroad Company, 1877, 96 U.S. 712, 24 L.Ed. 641; Brandies v. Cochrane, 1881, 105 U.S. 262, 26 L.Ed. 989; Weinstein v. Black Diamond S. S. Corporation et al., 1929, 2 Cir., 31 F.2d 519.

We have held the approval of the bond sufficient even where it recited that the appellants "[were] about to take an appeal." Crescent Wharf & Warehouse Co. v. Pillsbury, 9 Cir., 93 F.2d 761, decided January 4, 1938.

■ Since in all these cases, except the last, the only evidence of the jurisdictional step of petitioning for and allowing the appeal is in acts by the judge of the District Court subsequent to such allowance, from which the inference was drawn establishing the prior act of allowance, we are required to examine the record in this case for evidence of such subsequent action by the court. The record shows the following acts to have occurred:

On the 2d day of February, 1937, a written stipulation between the respective parties, providing what the apostles on appeal should contain and include, was filed with the clerk of the United States District Court for the Western District of Washington. This stipulation provided in part as follows:

"It is hereby stipulated by and between Grosscup, Morrow & Ambler, proctors for libelant, and Stratton, Leader, Little & Stratton, proctors for claimant, *that on the appeal* of the above entitled cause to the United States Circuit Court of Appeals for the Ninth Circuit, the apostles shall contain and include the following papers, proceedings and evidence, to-wit." (Italics supplied.)

On the 2d day of February, 1937, and on the same day the above stipulation was filed with the clerk, the District Court upon application duly made in open court entered an order transmitting and certifying exhibits to the Circuit Court of Appeals. In addition to an itemization of the exhibits to be certified and transmitted to the Circuit Court, the order provided as follows:

"Ordered that the clerk be and is hereby directed to transmit and certify to the United States Circuit Court of Appeals for the Ninth Circuit all the exhibits introduced into evidence in the above entitled case as above itemized, and further that the clerk be directed to forward his certification of the foregoing exhibits, together with the exhibits, to the United States Circuit Court of Appeals for the Ninth Circuit.

"Done *in open court* this 2nd day of February, 1937.

"John C. Bowen
"Judge."

(Italics supplied.)

On the 17th day of March, 1937, a stipulation between the parties was filed providing that supplemental apostles might be filed in the United States Circuit Court of Appeals which should include the transcript of the oral decision of the District Court rendered on the 18th day of December, 1936. Before the District Court's oral decision, which was transcribed to writing, was certified and transmitted to the Circuit Court in pursuance to the above-mentioned stipulation as to the contents of the supplemental apostles on appeal, the oral decision as transcribed was submitted to the District Court for examination and the District Court made certain corrections in the transcription of its oral decision and these corrections were initialed by the lower court.

The above constitutes as satisfactory evidence of the allowance of an appeal as the subsequent action of the court in approving the bond. The motion to dismiss is denied.

■ The evidence in this case is by depositions so far as concerns the responsibility of the ship for the accident and is to be considered here with a presumption in favor of the findings of the trial court in its lightest weight. The Ernest H. Meyer, The Eureka, 9 Cir., 84 F.2d 496, 501; Silver Line v. United States, 9 Cir., 94 F.2d 754, January 31, 1938.

The testimony establishes that it was part of the sailor's duty, to which he had been assigned by the engineer over him, to take certain floor mats from the engine room into the bunker space forward and clean them. The bunker floor was on the same level as the engine room floor and the space was lighted by an open hatch above sufficiently for him to walk forward on the starboard side of the vessel to the neighborhood of another open and unprotected hatch in the bunker floor leading to other bunkers below.

At the time of the accident there was sufficient visibility for the sailor to carry the mats to a place where he intended to beat them, but on arriving there in the dim light, and hampered by the mats, he failed to notice and slipped on a small, loose piece of piping and fell through the opening into the bunker below, receiving an injury to his leg.

The customary place of storage of the ship's spare piping appliances was on the right-hand side of this route of the sailor to the point where he beat out the mats. It had always been there on prior voyages, and for the voyage in question additional piping had been loaded into the bunker space and piled with the existing ship's supply. The testimony is unquestioned that this method of storage of the ship's spare piping rendered it likely to be rolled loose from the pile in the movement of the vessel on the voyage, and the chief and assistant

engineers testified that they kept a daily inspection, sometimes ten times a day, to see that the floor was clear of the piping. That is to say, they proved that this method of storage, existing when the voyage began, would make the place unsafe for the members of the crew walking on the bunker floor in the course of their duties unless prevented by this continuous vigilance. However, the danger in this particular case was not avoided, and from the evidence we cannot conclude that the engineers exercised their continuing duty to see that the ship's piping was kept in its usual place.

▮ Whether or not the small piece of pipe escaped from the pile due to the rolling of the ship or due to the fact that some one pulled the pile apart in searching for a piece of satisfactory length for some repair on the ship does not appear. Either was a likely happening from the method of storage of the spare parts of the ship's appliances as it existed on prior voyages and at the beginning of the voyage in question. We hence find that the ship started on the voyage for which the sailor had signed on but two days before, in an unseaworthy condition with reference to the use of the bunker space for the duties assigned to the sailor, and that this unseaworthiness and the vessel's failure to discharge its continuing obligation to the sailor to keep the repair appliances from scattering from the accustomed pile makes the ship liable to the sailor for the injury he suffered.

▮ This court has repeatedly held that the obligation of the vessel is to keep its appliances in such a condition that they will not cause injury to members of the crew. In The Colusa, 1918, 9 Cir., 248 F. 21, the appliance was a turnbuckle used with the chains hooked to the side of the vessel when lumber was stored on her deck, to secure it from the rolling of the vessel. In attempting to rig the appliance, the turnbuckle, due to a defect, broke away and in the recoil the sailor handling it with the boatswain was thrown through a hatch and received an injury. It was contended that it was the fault of the boatswain who ordered the use of the defective appliance, but the court held that it was the defect in the appliance itself which made the vessel unseaworthy, and that the unseaworthiness caused the injury As to this condition, the court said (page 24):

"But for the purposes of the present case we need only to refer to the rule which in the Osceola Case [189 U.S. 158, 171, 23 S. Ct. 483, 47 L.Ed. 760] was declared to be settled law:

"'That the vessel and her owner are, both by English and American law, liable to an indemnity for injury received by seamen in consequence of the unseaworthiness of the ship, or of failure to supply and keep in order the proper appliances appurtenant to the ship.'

"That rule, we think, is applicable here. The defect in the turnbuckle, if not obvious, was discernible by the exercise of reasonable care."

Here, the unseaworthiness consisted in an improper stowage of the spare piping appliances, creating a danger so "obvious" that the engineers testified to their continual vigilance to prevent its causing harm. So far as concerns the application of the Osceola Case, we can see no difference in causation between unseaworthy stowage of appliances causing such an injury as here occurred and the use of the turnbuckle.

The seamen injury cases indicate a growing area of responsibility of the owner in expansion of the meaning of the word "seaworthiness" historically corresponding with the changed conditions of seamen from the sailing vessel to the modern steamship. The latter, in so far as concerns the engine crew, is like a shore power house, plus a constantly shifting floor and walls and machinery, in the motion of the vessel. With these changed conditions we are no longer required to consider the sailor as an adventurous athlete assuming the risk of the rigging and yards as an expected and accepted incident of his employment. Applying the obligation of the ship of the very early cases to these modern conditions would be like saying that, because, when lime juice and other antiscorbutics were unknown as preventives of scurvy, a vessel sent to sea without them was seaworthy, a vessel is now seaworthy if going on a long voyage without preventives of scurvy and a diet producing it.

Later, in Pacific American Fisheries v. Hoof, 1923, 9 Cir., 291 F. 306, 308, a ladder customarily secured to the side of the vessel was loosened—freed from its fastenings, but left in place. The ship watchman displaced it as he was descending on it and was injured. This court held that it was the duty of some one other than the watchman to see that the appliance was secure in its place and that the duty was a continuing one, as follows:

"The duty of the master to provide a safe working place and safe appliances is a posi-

tive and continuing one, and cannot be delegated. It was claimed on the trial that it was the duty of the appellee to inspect the ladder in question, but the court below found otherwise, and of that finding there is no complaint. If that duty did not devolve upon the appellee, it devolved upon some one else, and whoever discharged that duty represented the master, and his negligence was the negligence of the master. *When the working place and appliances are unsafe, it is no answer to say that they were rendered unsafe at some previous time by the act of another servant. As already stated, the duty is a continuing one, and notice of defects and dangers will be imputed to the master where they could have been discovered by reasonable inspection and by the exercise of reasonable care.*" (Italics supplied.)

The holding of the last two sentences is particularly appropriate to the facts of the instant case.

 None of the cases cited by appellee question the legal principle that the vessel and owner are liable to the sailor for injury caused by unseaworthiness of the ship or her appliances existing at the beginning of the voyage or by failure in the continuing obligation of the owner to restore seaworthiness to either or both or prevent it harming the sailor. The inference from different factual situations leading to a finding of want of seaworthiness in the several cases cited do not, and in the nature of maritime employment cannot, create stare decisis. Even if, on the identical complicated probative facts and contradictory testimony in another case (and there is none such), another court found seaworthiness as an ultimate fact, it would not prevent us from weighing the evidence and making the contrary finding. Further consideration of these cases would unnecessarily burden this opinion. There was here unseaworthiness as the proximate cause of the injury without contributory negligence of the sailor or negligence of a fellow servant of a proximately causative character.

Since the trial court made no finding of the amount of damages under the theory of full responsibility therefor, it is instructed to find and to award such damage to the libelant.

Reversed.

### On Petition for Rehearing.

 The petition for rehearing asks us to reconsider our finding that it is not shown

how the pipe on which the sailor slipped escaped or rolled from the pile of piping alongside the path the sailor was required to follow in obeying the order to clean the mats. No one testified he saw anyone cause it to roll there while searching for another piece in the unconfined pile. The burden of proof of the defenses of contributory negligence or of an act of a fellow servant, if they are available here, is on the ship. See Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 557, 11 S.Ct. 653, 35 L.Ed. 270.

In the dim light it was quite likely that, without negligence, anyone disturbing the pile would cause a piece to roll where the sailor slipped on it, without knowing it was there. The proximate cause was the unconfined pile in the dim light along the sailor's path.

Petition denied.