### JOHNSON v. GRIFFITHS S. S. CO.
### No. 10904.

Circuit Court of Appeals, Ninth Circuit.
June 29, 1945.

Sam L. Levinson, of Seattle, Wash., and Albert Michelson, of San Francisco, Cal., for appellant.

Bogle, Bogle & Gates, Stanley B. Long, and Edw. S. Franklin, all of Seattle, Wash. (John H. Black and Edward R. Kay, both of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, HEALY, and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

This is an appeal from a final decree in admiralty dismissing the libel in personam brought under the Jones Act, 46 U.S.C.A. § 688, by the administrator of the estate of decedent on behalf of the surviving parents.

Except for the introduction of formal proof by the Deputy Shipping Commissioner in Seattle who identified the official log book, all evidence in support of appellant's claim was presented by deposition. Appellee offered no evidence.

The decedent, Lincoln B. Kaumeheiwa, Jr., was twenty-four years of age, in good health and spirits. At the time of his death he was employed as a seaman on the merchant vessel S. S. Stanley A. Griffiths, which was owned and operated by appellee herein.

On the morning of March 3, 1943, while the vessel was lying anchored offshore from Oglingo Harbor, where it had been discharging cargo, the body of decedent was found in the lower hold of No. 1 hatch which had been left open. Several hours later, he died from injuries received from the fall.

The official log entry reporting the occurrence, signed by the Master of the Vessel and by the Second Officer as a witness, which was read into the record, is as follows:

"March 3, 1943, 6:30 A.M., Mr. Lincoln B. Kaumeheiwa was told to go forward to investigate the anchor chain, which was making a lot of noise and grindings. After

investigation, upon returning aft, said man fell into No. 1 lower hold, receiving injuries which caused his death later on the same day. Same day the body was transferred to the Coast Guard vessel 'Hurura' for Adak Island, where he was buried."

There was a further reference in the log book, as follows:

"Death that has happened aboard and cause thereof: Lincoln B. Kaumeheiwa, Able Seaman, died, 10:40 a.m. March 3d, 1943, from injuries due to his fall into No. 1 Lower Hold, 6:30 a.m. same day."

At the conclusion of the case, the trial court stated that "although one or more negligent conditions may have been established preponderantly, that there is no proof as to whether or not that ʼone, or whether or not one or more of the negligent conditions alleged, proximately caused the injuries complained of." And in his Findings of Fact the District Judge announced that "assuming, but without so finding, that respondent, Griffiths Steamship Company, a corporation, was guilty of any or all of the acts of negligence as charged in paragraph II of the libel, libelant has failed to establish that the death of said Kaumeheiwa was proximately caused thereby."

▉ Since all material facts in this case were established by deposition, the findings of the District Court are not accorded as great weight as they might be if that court had had an opportunity to observe and hear the witnesses testify to the facts.[1] Furthermore, since this is a case in admiralty, the matter may be tried de novo in this court.[2]

As a matter of fact, there is no substantial dispute as to the facts. The record discloses that no one actually saw the deceased fall. Nevertheless, it is clear from the record that he did fall into the open hatch and that he did die as a result of the injuries sustained by the fall.

The three witnesses who testified by deposition were members of the crew and ship mates of decedent. Witness Lau stated that it happened on a dark morning; that it was an unsafe harbor and it was blowing all the time; that at the time he [decedent] fell "she was blowing" and there was a heavy ground swell causing the ship to pitch and roll; that they were blacked out every night all the time; that the entrance to the chain locker is amidships, in the alley going forward, just forward of No. 1 hatch; that there is about three feet of space between that entrance and the forward part of No. 1 hatch; that there is a steampipe running right alongside that entrance, crosses the passageway and then runs alongside the hatch; that the guard on the steampipe was loose; that it balances over to one side when you step on it; that the guard is a foot high and a foot wide, and you had to step on it or over it to get back in the passageway on the port side; that the escaping steam caused poor visibility; that there was a deckload on the starboard side so that they had to use the port side for ingress and egress; that the last time he [the witness] was in that passageway, about three o'clock in the afternoon before the deceased was killed the guard was still loose, steam was shooting over it all the time, there was debris and dunnage and some tarps lying in the passageway on the port side but they had to use that side because there was a big grader on the deck on the starboard side and it was all lashed down.

Joseph E. Barr, another witness, stated that the hatch was open most all of the time and "most certainly that night that he fell"; that there is very little space between the forward coaming of No. 1 hatch and the bulkhead at the entrance to the forepeak; that "You cannot walk through, you have to crowd through"; that the weather was freezing and they kept the steam going all the time; there was ice and snow and sleet on deck; that the steam guard was loose and there was a very bad leak and the steam was condensing all the time so that they could hardly see down the hatch; that the passageway

[1] The Natal, 9 Cir., 14 F.2d 382; The Indien, 9 Cir., 71 F.2d 752; The Ernest H. Meyer, 9 Cir., 84 F.2d 496, certiorari denied Hammond Lumber Co. v. Broughton & Wiggins Nav. Co., 299 U.S. 600, 57 S.Ct. 193, 81 L.Ed. 442; Thomas v. Pacific S. S. Lines, 9 Cir., 84 F.2d 506; The Diamond Cement, 9 Cir., 95 F.2d 738; Alioto v. Imahashi, 9 Cir., 115 F.2d 324; The Ariadne, 13 Wall. 475, 20 L. Ed. 542.

[2] Olsen v. Alaska Packers, 9 Cir., 114 F.2d 364; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Brooklyn Eastern Dist. Terminal v. United States, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240.

on the port side was full of dunnage and you had to go over that dunnage and over the loose guard; there was no other way; that they had a steamshovel and bulldozers on the starboard side which took all the space, so that in order to get through on the starboard side it would be necessary to travel over the equipment; hence no one used the starboard side; the port side was the only way and they used that altogether; that there was no life line or guard around No. 1 hatch the night before the accident; that the ship was rolling; that they were blacked out and it was very, very dark; that about six o'clock in the morning (before breakfast) he heard a scream, then yelling for "Winchie" because they wanted a winch-driver to help bring the body up; that the deceased was still alive, though unconscious; that the deceased was a very healthy, cheerful young man, kind of mischievous and full of pep. Witness Barr also testified that the steam pipe was bursting and the cover was off because the engineers had been working on it; that they [the crew] "squawked" about it several times.

The third witness' testimony was substantially the same.

It is thus clear from the record, which the District Court recognized, that one or more negligent conditions have been established. The trial court, nevertheless, dismissed the suit because "there is no proof as to whether or not that one, or whether or not one or more of the negligent conditions alleged, proximately caused the injuries complained of." With this we cannot agree.

■ It is the duty of a vessel to provide a safe working place for members of its crew.[3] What does it matter which one or how many of the negligent conditions caused the injury? There is evidence that the vessel was anchored in an open roadstead, under blackout conditions with no lights on deck; the weather was freezing and ice and sleet were on the deck; the vessel was pitching heavily; the passageway in the forepeak was obstructed with dunnage and debris; the guard on the steampipe over which the men were required to walk was loose and shaky causing

limited visibility from the leaking steam. Under these circumstances the maintenance of an open hatch with no lifeline about it constitutes negligence which is so closely related to the injury in this case as to impel the conclusion that it was the proximate cause of the death.

■ In determining proximate cause, it is not essential that the causal connection be shown by direct evidence; the causal connection can be shown by facts and circumstances which, in the light of ordinary experience, reasonably suggests that the defendant's negligence in the manner charged operated proximately to produce the injury. 38 Am.Jur. 334.

It is reasonable to conclude that the negligence established in this case was sufficient to have been the cause of the injury, if the deceased was at the point where this negligent condition prevailed. The established facts are that the deceased was found in a dying condition at the bottom of the hatch at or shortly after the time he was required to go forward into the forepeak to attend to his duty. The hatch was open; there was no other method of entrance into the forepeak except over the main deck, alongside of this open hatch, and through the littered and obstructed passageway. With no lights, freezing weather, ice and snow afoot and rolling and pitching of the vessel, the inference is compelling that the man fell into the hold as the proximate result of the failure of appellee to keep the passageway free from obstructions and the failure to maintain a lifeline around the open hatch under the existing conditions.

■ The record discloses, and the District Court so stated in its oral opinion that a close relationship existed between the deceased and his parents. He was the youngest son, dutiful, affectionate and conscientious. He made regular monthly contributions to his parents and presented them with material gifts on his visits home. The monthly contributions consisted of half of his regular salary. When he lived at home and worked during the summers of 1937, 1938, 1939 and 1940, he turned over to his parents his entire earnings of $100 per month. The parents are entitled to damages commensurate with their loss.

[3] Pacific-American Fisheries v. Hoof, 9 Cir., 291 F. 306; The Diamond Cement, 9 Cir., 95 F.2d 738; The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

The judgment of the trial court is reversed and the case is remanded to the lower court to ascertain and compute the damages sustained.