JULIÁN R. RIVERA, Plaintiff and Appellee, *v.* FRANCISCO A. CRESCIONI, Defendant and Appellant.

No. 10725.   Argued January 26, 1953.—Decided August 4, 1954.

44

*Ángel M. Villamil* for appellant. *Eduardo Cuchí Coll* for appellee.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

Julián R. Rivera filed in the former District Court of San Juan a complaint "for nonperformance of contract" against Francisco A. Crescioni, alleging that plaintiff sold to defendant 1,500 cartons or cases, each containing 24 cans, of native juice, "to be shipped to the city of New York for purposes of sale, for which the defendant was bound to pay to the plaintiff the sum of $2.10 per carton . . . upon arrival of the merchandise in New York and removal by the defendant"; that two shipments were made, the first of 500 cartons and the second of 1,000, for which Crescioni did not pay and still owes to Rivera the sum of $3,150, which represents the total selling price of those cartons; that in addition defendant owes to plaintiff the sum of $77 for expenses incurred by the latter in the storage and transportation of 577 cartons which the defendant returned to Puerto Rico, "plus 6 per cent legal interest on the aggregate of the sums due up to date, which defendant refuses to pay notwithstanding the repeated demands made by plaintiff." Plaintiff urged the court to order the defendant to pay him the aforesaid sums of $3,150, $77 for storage and transportation, in addition to legal interest at the rate of 6 per cent on the aggregate sum, $500 for attorney's fees, and the costs.

Defendant Crescioni answered the complaint denying that plaintiff sold him the cartons in question, "but that plaintiff himself, while in Puerto Rico, shipped, paid freightage, and consigned to Centaur Trading Company, in New York, the merchandise in question, for which the consignee, namely, the defendant, was bound to pay after it was sold in New York"; that there was involved an agreement of consignment; that the defendant returned 600 cartons to plaintiff, and that the remaining 900 cartons consigned for sale in New York are stored in New York, at plaintiff's disposal, and that the juices are in bad condition for human consumption.

After a hearing of the case on the merits, the San Juan Court rendered judgment ordering the defendant to pay to plaintiff the sum of $1,580, plus costs, and $200 for attorney's fees. The court made the following findings of fact and conclusions of law:

"Findings of Fact

"1. That plaintiff is over 21 years of age, married, a businessman, and resident of Santurce, Puerto Rico; and that the defendant is also over 21 years of age, married, proprietor, and a resident of the municipal district of Río Piedras, Puerto Rico.

"2. That on March 10, 1949, the defendant was the owner and President of the Centaur Trading Company, a commission business, with principal offices in the city of New York, United States of America; and that plaintiff was the owner of the Tropical Fruit Industry, of Puerto Rico, a native-juice canning business for purposes of exportation.

"3. That plaintiff and defendant transacted mutual business in their respective branches, the former consigning to the latter canned juice from Puerto Rico. Plaintiff shipped to the United States, consigned to the defendant, the product which was the object of the transaction.

"4. That on March 10, 1949, after paying the freightage, plaintiff shipped to New York, consigned to Centaur Trading Company (defendant), 1,000 cartons, each containing 24 cans of tamarind and guanábana juice, for which defendant was bound to pay to plaintiff the sum of $2.10 per carton after the merchandise was sold in New York.

"5. That about one month later plaintiff shipped to New York 500 cartons of juice, each containing 24 cans, consigned to the defendant, under the same conditions as the first 1,000 cartons mentioned above.

"6. That of these 1,500 cartons the defendant returned to plaintiff 600 cartons, which the latter disposed of after removing them from one of the piers in San Juan.

"7. That defendant disposed of the remaining 900 cartons in New York and did not return them to plaintiff, as he could have done and did with the 600 cartons above mentioned.

"8. That the value of the said 900 cartons of canned juice at the time of the transaction was $2.10 each, or a total of $1,890.

"9. That plaintiff received from the defendant the sum of $300 on account of the juices.

"Conclusions of Law

"In view of the findings of fact made by the court, the court is of the opinion that the defendant owes to plaintiff the sum of $1,590 in payment of 900 cartons, each containing 24 cans of juice, at the price of $2.10 per carton, less $300 already received by the defendant. Although it is true that the contract was one of consignment, and that the defendant was entitled to return, and did return to plaintiff, 600 cartons which were spoiled, he retained 900 cartons and disposed of them at his will, and he is therefore bound to pay for them.

"Judgment will be rendered in favor of plaintiff for the sum of $1,580, plus the costs of this suit, and the sum of $200 for attorney's fees." '

Defendant appealed to this Court.

■ At the hearing of the case, plaintiff testified in part that he had made a verbal contract with the defendant for the sale of the cartons of juice, and that Crescioni had purchased the juice directly from him at $2.10 per carton. However, Enrique Coll Moya, plaintiff's witness and employee, testified that he was present when Rivera and Crescioni made the verbal contract, and that Crescioni said to plaintiff: "Well, let us do business. I am going to New York and, if you give me the representation, I will sell those juices there in New York," and that the business was transacted on the basis of $2.10 per carton. In his testimony, the defendant stated in part as follows: "At his suggestion that he wished to sell them, I agreed to ship them to New York to be sold there, and to pay for them *as soon as they were sold* at the rate of $2.10 f.o.b. New York . . . (I would pay for the juices) *as soon as they were sold.* . . . whatever I sold, the difference in that price ($2.10), was for our benefit." (Italics ours.) He was asked as follows: "Then the agreement was that you accepted provided they were consigned to your firm in New York, and that *you would pay*

*if you sold them?"*, to which the defendant answered as a witness: "To guarantee the payment if it was sold . . . at $2.10 per carton."

The court of first instance disbelieved plaintiff's testimony to the effect that the original contract made by the parties had been one of purchase and sale, and that Crescioni had purchased the juice directly from plaintiff. Rather, the lower court believed the theory of the defendant, as witness, set forth above, and found that the defendant "was bound to pay to plaintiff $2.10 per carton after the merchandise was sold in New York." We must respect and give effect to that finding which is supported by the evidence.

■ There was a specific contract between the parties, whereby defendant Crescioni assumed the obligation to pay to plaintiff $2.10 per carton of juice cans as soon as they were sold to a third person. The uncontroverted evidence showed that the defendant sold all the 1,500 cartons to Ángel Víctor Albandoz before the juice arrived in New York. Therefore, the condition in the contract between plaintiff and defendant whereby the latter was bound to pay $2.10 per carton to plaintiff was met. Such obligation arose conclusively when defendant sold the entire 1,500 cartons to Albandoz. As soon as the sale was made to Albandoz, the defendant incurred a liquidated and absolute debt in favor of plaintiff for the sum of $3,150 (1,500 × $2.10).

■■ The San Juan Court held that the contract was one of consignment, and that defendant's obligation to pay the sum of $1,890 to plaintiff (900 × $2.10) arose from the fact that the defendant, after returning 600 cartons to plaintiff, failed to return the remaining 900 cartons. However, defendant's indebtedness is not based on the failure to return the cartons, but on the performance of the condition set forth in the contract between the parties concerning the sale of the juices by defendant to a third person, the performance of which resulted in the creation of a liquidated and absolute indebtedness on the part of the defendant to plaintiff, on the

basis of $2.10 per carton. The appeal is from the judgment and not from the grounds thereof, and the judgment was valid in so far as it predicated and gauged defendant's liability on the payment to plaintiff of the sum of $2.10 per carton.

From the point of view of the reality of the existence of defendant's obligation to pay $2.10 per carton to plaintiff, we need not determine specifically, in view of the facts herein involved, the juridical classification of the transaction between the parties, that is, whether it was a consignment, a commercial commission contract, or a commercial purchase and sale. We are merely concerned with a contract between the parties in which there was fulfilled the condition therein set forth as basis for the legal creation of a liquidated debt by the defendant in favor of plaintiff. Irrespective of how the contractual relation between the parties is labelled, the fact is that the defendant incurred an absolute obligation in favor of plaintiff and failed to perform it.

In its findings and judgment the lower court held that the defendant returned 600 cartons to plaintiff, which the latter accepted, the implication being that plaintiff has no claim against the defendant to the said 600 cartons. Plaintiff has not appealed to this Court from the judgment, especially from the pronouncement unfavorable to him, and, in the absence of such challenge before this Court, we can not rule whether or not the pronouncement of the San Juan Court releasing the defendant from liability as to the said 600 cartons was null and void. This is also true as to the holding of the lower court that "plaintiff received from the defendant the sum of $300 on account of the juices." In any event, irrespective of the legal grounds relied on by the San Juan Court, it acted correctly in holding defendant liable for the payment to plaintiff of the sum of $2.10 per carton as respects the 900 cartons (less the sum of $300 already mentioned). Such pronouncement is ratified for the reasons herein set forth.

The theory set up by defendant-appellant in his brief is that he was unable to return to plaintiff the remaining 900 cartons in view of the request of plaintiff himself not to return them. However, as has been seen, defendant's liability is not predicated on the fact that he did not return the cartons but on the fulfillment of the condition precedent set forth in the contract.

The question of plaintiff's right to interest at 6 per cent on the amount due him by the defendant, to be computed from the date defendant's liquidated obligation was incurred, namely, from the moment defendant sold the cartons to Albandoz, has been under the consideration of this Court. Plaintiff claimed such interest in his complaint and, actually, he had a right to it as indemnity for the default committed by Crescioni upon his failure to pay. Section 1061 of the Civil Code provides as follows:

"Should the obligation consist in the payment of a sum of money, and the debtor should be in default, the indemnity for losses and damages, should there not be a stipulation to the contrary, shall consist in the payment of the interest agreed upon, and should there be no agreement, in that of the legal interest.

"Until another rate is fixed by the Government, interest at the rate of six per cent per annum shall be considered as legal."

In this connection, see *Martínez Fernández & Cía., S. en C.* v. *García*, 68 P.R.R. 363, 369; *Sucs. de Pérez Bros* v. *Sucs. of Abarca*, 33 P.R.R. 102, 104; *Del Río* v. *Sastre*, 9 P.R.R. 174; and *Cajigas* v. *Succession of Prats*, 5 P.R.R. 142. Section 234 of the Code of Commerce provides that "Debtors who delay the payment of their debts after the same have fallen due, must pay, from the day following that on which it became due, the interest agreed upon in such case, or in the absence of such agreement, the legal interest." See *Cintrón & Aboy* v. *Solá*, 22 P.R.R. 245. See, also, Act No. 5, approved August 17, 1933 (Spec. Sess. Laws, p. 26).

The defendant herein committed default at the time he sold to Albandoz, and from that moment plaintiff was entitled to interest at 6 per cent, by way of indemnity, namely, from the date defendant actually became liable therefor. *Sucs. of Pérez Bros.* v. *Sucs. of Abarca, supra.* However, the court of first instance did not include in its judgment any pronouncement on interest, nor order the defendant to pay interest to plaintiff. Notwithstanding that omission, plaintiff did not appeal to this Court from the judgment rendered by the lower court, nor challenge the omission of the trial court to order the defendant to pay interest. This Court can not add to the judgment any specific indemnity for damages if the person entitled to such indemnity has not appealed to this Court from the omission of the court of first instance to include such indemnity in its judgment, that is, if the person entitled to receive payment of the indemnity has not challenged such omission before this Court. An appellate court will not increase the amount of a judgment, especially as to indemnities for damages, where the party in whose favor the judgment was rendered has not appealed or presented any question in the appellate court as to the amount of the judgment. 5 C.J.S. 1375, § 1883, note 79; *Lee* v. *William Bailey Corp.,* 196 N. E. 9, 11; *Kerens Nat. Bank* v. *Stockton,* 40 S. W. 2d 7.

In *Padilla* v. *Vidal,* 71 P.R.R. 483, 492, it is held that although interest is not mentioned in the judgment, such interest, by express provision of the law, is a part of the judgment and recoverable. In that case, interest should be considered automatically as part of the judgment, by express provision of the law. However, default interest is not in the same category. It is not an integral part or inherently inseverable from the principal obligation, but is considered as an independent indemnity for damages, by way of penalty, for default in payment. As such indemnity, which is a personal right of the creditor, it may be waived by the creditor by not appealing to this Court from the failure of

the lower court to order its payment. We are not concerned with a penalty automatically attached to the principal obligation by express provision of the law. Therefore, no pronouncement on the payment of interest is in order.

The judgment appealed from will be affirmed.

Mr. Justice Sifre concurs in the result.

_____

Mr. Justice Belaval, dissenting.

This is an action of nonperformance of contract wherein Julián R. Rivera, plaintiff-appellee, alleged in the former District Court of San Juan, Puerto Rico, that in March and April, 1949, he sold to Francisco A. Crescioni, defendant-appellant, 1,500 cartons of cans of juice at the rate of $2.10 each, to be paid upon arrival of the merchandise in New York and removal by defendant; that upon demand to pay the merchandise thus removed, defendant refused to pay alleging, among other reasons, that some of the cans were in bad condition for human consumption; further, purchaser Crescioni advised plaintiff that in one of the piers in San Juan there were 577 cartons of juice cans at plaintiff's disposal which he had returned alleging that they were in bad condition for human consumption, and that plaintiff was compelled to remove such cartons from the pier and store them in his factory.

Defendant Crescioni answered denying that plaintiff sold to him the said cartons of canned juice, alleging on the contrary *that said merchandise was consigned to defendant by Rivera*, wherefore defendant was bound to pay for it as soon as it was sold in New York; that defendant was compelled to return 600 cartons of the merchandise consigned by plaintiff because it was in bad condition for human consumption and he was unable to sell it there; that the remaining cartons of juice cans were still stored in New York in the hands of several dealers who refused to pay, alleging that the juice was in bad condition for human consumption, but that they

were willing to reship them to Puerto Rico provided the appellee agreed to pay the corresponding storage, transportation, and freightage.

After a hearing of the case in the District Court of San Juan, the trial court made the following findings of fact and conclusions of law:

"1. That plaintiff is over 21 years of age, married, a businessman, and resident of Santurce, Puerto Rico; and that the defendant is also over 21 years of age, married, proprietor, and a resident of the municipal district of Río Piedras, Puerto Rico.

"2. That on March 10, 1949, the defendant was the owner and President of the Centaur Trading Co., a commission business, with principal offices in the city of New York, United States of America; and that plaintiff was the owner of the Tropical Fruit Industry, of Puerto Rico, a native-juice canning business for purposes of exportation.

"3. That plaintiff and defendant transacted mutual business in their respective branches, the former consigning to the latter canned juice from Puerto Rico. Plaintiff shipped to the United States, *consigned to the defendant,* the product which was the object of the transaction.

"4. That on March 10, 1949, after paying the freightage, plaintiff shipped to New York, *consigned* to Centaur Trading Company (defendant), 1,000 cartons, each containing 24 cans of tamarind and guanábana juice, for which defendant was bound to pay to plaintiff the sum of $2.10 per carton *after the merchandise was sold in New York.*

"5. That about one month later plaintiff shipped to New York 500 cartons of juice, each containing 24 cans, *consigned to the defendant,* under the same conditions as the first 1,000 cartons mentioned above.

"6. That of these 1,500 cartons the defendant returned to plaintiff 600 cartons, which the latter disposed of after removing them from one of the piers in San Juan.

"7. That defendant disposed of the remaining 900 cartons in New York and did not return them to plaintiff, as he could have done and did with the 600 cartons above mentioned.

"8. That the value of the said 900 cartons of canned juice at the time of the transaction was $2.10 each, or a total of $1,890.

"9. That plaintiff received from the defendant the sum of $300 on account of the juices.

". . . . . . .

"In view of the findings of fact made by the court, the court is of the opinion that the defendant owes to plaintiff the sum of $1,590 in payment of 900 cartons, each containing 24 cans of juice, at the price of $2.10 per carton, less $300 already received by the defendant. *Although it is true that the contract was one of consignment,* and that the defendant was entitled to return, and did return to plaintiff, 600 cartons which were spoiled, he retained 900 cartons and disposed of them at his will, and he is therefore bound to pay for them.

"Judgment will be rendered in favor of plaintiff for the sum of $1,580, plus the costs of this suit, and the sum of $200 for attorney's fees." (Italics ours.)

The only two errors assigned on appeal by defendant-appellant are the following: (1) "The trial court committed the manifest, inescapable, and fatal error of variance between the judgment and its own juridical theory and the evidence offered at the trial"; (2) "The trial court erred in weighing the evidence and in holding that defendant retained of his own will 900 cartons of cans of native juice, which conclusion is not supported by the evidence."

As to the first assignment, appellant's position seems to be that, since the merchandise was consigned to him as agent, he was not liable for its value in the event of destruction or damage resulting from inherent defect of the merchandise.

Strictly considered, the contract of consignment does not exist in mercantile law. Consignment is merely a feature of the delivery or deposit of merchandise, within the classical and special contract of commercial commission for purposes of sale. This being so, the relations between the consignor and the consignee must be determined in the light of the rights and obligations of the commercial commission.

What appellant contends is that the juridical relation existing between him and the appellee should be considered an ordinary commercial contract of principal and agent and not a commercial commission, properly speaking. As a ques-

tion of reality, the ordinary commercial contract of principal and agent and the commercial commission are identical in substance although they are distinguished in the manner in which the agent intervenes, for in the case of the ordinary commercial agency contract the agent intervenes in the name and for the account and risk of his principal, except in case of fraud or overstepping of the power granted, as is done by the factor, the shop clerk, or the business clerk, while in the case of a commercial commission the agent intervenes on behalf of his principal or in his own name, but in either case he is bound to comply with all the obligations for such cases provided in the Code of Commerce. *Manual de Derecho Mercantil* by Lorenzo Benito (ed. by Victoriano Suárez of Madrid, 1929), Vol. III, p. 88. The essential difference between both forms of agency is rather related to the obligations assumed as to third parties than to the obligations between principal and agent, or constituent and commission merchant. When the agent acts on the authority of a mercantile agency, he does so on behalf of his principal, who is directly bound to third parties with whom the agent contracts, such third parties being directly bound to the principal. When the agent acts on the authority of a commercial commission, in his own name, the constituent is not directly bound to third parties with whom the agent contracts, nor are such third parties directly bound to the constituent. *Comentarios al Código de Comercio* by José María González de Echávarri y Vivanco (ed. by Casa Martín of Valladolid, 1945), Vol. I-II, pp. 205 *et seq.*

However, we are not concerned here with the juridical relations between principal and constituent and third parties, but between principal and agent or constituent and commission merchant. From the evidence presented, we must rule out the possible juridical relations between principal and agent, since in the instant case the appellant acted in his own name, with merchandise consigned to him by the appellee.

The need to expand the business beyond the geographical bounds of the "old city," or of the "league," or of the "nation" where the principal business firm of the merchants is situated, created the need for establishing a special commercial contract of agency which in time would be known in the science of mercantile law as a commercial commission, to pursue two main objectives: (1) to permit the agent, known as commission merchant, to contract in his own name, to face the natural distrust of consumers who dislike to contract with any person outside the place of business, said agent being directly bound to the local consumers, and (2) to regulate the relations between constituents and commission merchants in a way safer to the constituents, since the commercial operations will be carried out at a remote point where it would not be possible for the merchants to exercise the same degree of vigilance as if the operations were handled by an agent within their own places of business.

Although the commercial commission is substantially a commercial agency contract, it is characterized as an agency where the agent, known as commission merchant, may act in his own name, it being more beneficial to mercantile operations that a person be directly responsible to third parties who contract with the agent, at a remote place of business (*distantia loci*). However, in the relations between a constituent and commission merchants, the latter, like the agents, are not liable to their principals for the obligations contracted either in the constituent's or in their own name, provided their obligations as agents have been duly performed. Using the language of R. Gay de Montellá in *Código de Comercio Español* (ed. by Casa Editorial Bosch of Barcelona, 1936), Vol. III, part 1, p. 39: "In the relations between constituent and commission merchant, the commission is substantially an agency. Except in case of fraud or fault in the execution of the contract, the commission merchant assumes no responsibility to the constituent with respect to the obligations contracted by those persons

with whom he has contracted, nor may the constituent require the commission merchant to comply with such obligations, much less to pay him for damages resulting from the insolvency of third parties." By the same token, he is not liable for the nonperformance of contracts by third parties in the event of any inherent defect of the thing.

However, for the same reason that the commercial commission is a special agency to be carried out at a remote place of business, the mercantile statutes contain a lengthy enumeration of obligations and an exhaustive imposition of responsibilities with which the agent must comply, in order to protect the constituent against the risks foreseen in a mercantile operation carried out at a distance which makes it almost impossible for him to supervise personally the commercial operations transacted by his agents.

The responsibilities of the commission merchant for the consigned merchandise under the Commercial Code of Puerto Rico are the following:

1. To be responsible for the goods and merchandise he may receive   (Section 183) ;

2. To be responsible for their preservation in the condition in which he received the same   (Section 184) ;

3. To sell, with the authorization of a competent authority, those goods which suffer any change making their sale urgent in order to save as much as possible of their value (Section 187) ;

4. Not to sell on credit or on time without authority from the principal   (Section 188) ;

5. To collect credits of his principal at the time they are demandable   (Section 191) ;

6. To insure the goods consigned if he has received orders from the principal   (Section 192) ;

7. Not to transact any business at prices or under conditions which are more onerous than the current market rates on the date on which it took place   (Section 176) ;

8. To observe the provisions of the laws and regulations with regard to the transaction which has been intrusted to him   (Section 177) ;

9. Not to delegate or substitute the commissions he may receive without the authority of his principal   (Section 179) ;

10. Not to invest or use for a different purpose the funds advanced for the discharge of a commission   (Section 182) ;

11. Not to change the marks on the goods he may have sold for the account of another, nor to handle goods of the same kind belonging to different parties, bearing the same mark   (Sections 185 and 186) ;

12. *Not to purchase for himself or for another person* what has been given to him to sell, without the permission of the principal   (Section 185).

These are "the obligations of a good merchant" established by our Code of Commerce to be fulfilled by the commission merchant on behalf of his constituent.   In the same way that "it cannot be conceived how the agent may assume the obligation to do a thing in his own right"—R. Gay de Montellá, *op. cit.*, p. 15—we cannot conceive of a commercial commission in which the commission merchant purchases for himself or for another what has been given him to sell.   "If the commission merchant purchases for himself or for another that which has been given him to sell, or sells that which he has been ordered to purchase, without permission of his constituent, the commission merchant does not act as such with respect to the constituent *but as any purchaser or seller.*"   R. Gay de Montellá, *op. cit.*, p. 36.

The only two instances where a commission merchant would be liable to his constituent for the operations transacted for the latter, are: (1) when the commission merchant receives, besides the ordinary commission, a commission called a guaranty commission (*"seguro del buen dinero"*) for his services, in which case the risks of the collection are for his account, it being the duty of said com-

mission merchant to pay to the constituent the proceeds at the same periods as agreed upon with the purchaser (§ 190); (2) when the commission merchant sells on credit or on time without authority from the constituent, the latter being permitted in such cases to require cash payment of the agent, who is entitled to any interest, profit, or advantage which may arise from the transactions (§ 188). The other responsibilities of the commission merchant are those arising out of *fault* or *fraud* resulting from the failure to perform some part of the commercial commission, or from some action against the best interests of his constituent.

In the case of an action of nonperformance of a commercial commission arising out of fault or fraud, the constituent is entitled to recovery of damages independently, in some instances, of the monetary value of the mercantile operation. Sections 166, 170, 174, 176, 182, 185, 191, and 192 of our Code of Commerce deal with the recovery of damages. The conservation or timely public sale of the consigned goods is among the responsibilities arising out of fault for failure to comply with the commission. As stated by the learned professor José María González de Echávarri y Vivanco at p. 212 of his commentaries, *supra,* "as to the merchandise, the commission merchant assumes obligations *from the time of consignment to him,* it being his duty to defend the rights of the constituent against carriers and captains; no less is his duty in connection with the conservation and custody of the merchandise, since he must apply the diligence of a good merchant to prevent its loss and damage . . . It is also his duty not to avail himself of the advantages which the commission entrusted to him may yield to the constituent, for all such advantages, as *lucri causa,* must yield returns to the constituent."

Appellant's theory is that, since we are dealing, as we probably are, with a consignment of merchandise within a possible special commercial commission for purposes of sale, he is not responsible to the appellee for the operations trans-

acted with third parties, who have refused to pay the price of the merchandise on the ground that the same was damaged. We are agreed that that would be the real juridical situation, if appellant would in turn convince us that in the instant case he duly performed his obligations as commission merchant within the commercial commission.

However, the evidence in the instant case on the disposal of the damaged merchandise leaves no room for doubt as to the agent's liability for the nonperformance of the commercial commission, assuming that the real juridical relation between appellee and appellant was one of a special commercial commission for purposes of sale. Of the 1,500 cartons shipped to New York, 600 were re-shipped to Puerto Rico and removed from the San Juan pier by appellee. Of the remaining 900 cartons, 196 were sold and collected for from the retailers by Albandoz and paid for by the latter to appellant. As to the remaining 704 cartons it is rather odd how they were disposed of, though they were timely received without legal objection. Albandoz claims that some of the cartons were returned by some retailers, but that others are still in the hands of the retailers. Some of the cartons returned to Albandoz are still in the basement of an establishment of Albandoz in New York; the others were destroyed by Albandoz himself in the presence of the garbage collectors, by means of a sort of private confiscation, without resorting to any judicial or administrative authority who could have confiscated them legally as being a menace to public health. It cannot be ascertained from the evidence how many of the cartons, still in possession of Albandoz and his retailers in New York, are in such a state of deterioration or damage that they cannot be sold in the market. Under § 184 of the Code of Commerce of Puerto Rico, it is the agent who is obliged to prove the impairment of the merchandise in a legal manner. The burden of proof rests with him as soon as the fact of the delivery is established.

If this was a case of a consignment within a commercial commission contract, as appellant seeks to establish, under §§ 183 and 184 of the Code of Commerce of Puerto Rico, related to § 187 of the same Code, the agent was responsible for the preservation of the consigned merchandise in the same condition in which it was received. If, by lapse of time or inherent defect in the goods, "the goods should suffer any change, making their sale urgent in order to save as much as possible of their value, and the haste were such that there is no time to advise the principal and await his orders, the agent shall apply to the judge or court of competent jurisdiction, who shall authorize the sale with the formalities and precautions he may consider most beneficial to the principal." Gay de Montellá, *op. cit.*, pp. 33 and 36; *Curso de Derecho Mercantil* by Pablo González Huebra (ed. by Librería Sánchez of Madrid, 1867), Vol. I, p. 266. If the merchandise was so damaged that it was a menace to public health, the agent was under the duty to advise the health authorities to enable them to confiscate the merchandise.

But the error assigned in this Court is that "the lower court committed the manifest, inescapable, and fatal error of variance between the judgment and its own juridical theory and the evidence offered at the trial." Appellant's contention seems to be that the trial court's conclusion of law that the contract was one of consignment, conflicts with the finding of the same court that appellant was bound to pay to appellee $2.10 per carton as soon as the merchandise was sold in New York. The contract of consignment first appears as a finding of fact in the fourth finding, the pertinent part of which reads: Plaintiff shipped to New York 1,000 cartons of juice *consigned* to the defendant, who was bound to pay to plaintiff the sum of $2.10 per carton *after the merchandise was sold in New York*. The contract of consignment next appears as a conclusion of law in that portion of the conclusions which reads: "Although

it is true that the contract was one of consignment, and that the defendant was entitled to return, and did return to plaintiff, 600 cartons which were spoiled, he retained 900 cartons and disposed of them at his will, and he is therefore bound to pay for them." We must first dispose of the finding of fact in the light of the transcript of the evidence.

It is high time that we determine, in a more scientific and modern spirit, the true scope of the provision of Rule 52(a) of the Rules of Civil Procedure for the Courts of Puerto Rico, that "Findings of fact based on oral testimony shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." As is always the case whenever it is sought to clarify any legal problem, we must begin by establishing the theory under which the institution of corresponding law has been provided for.

The impossibility of reproducing before the appellate or reviewing courts the purely expressive elements of oral testimony, made it the duty of those courts to respect the weighing by the trial judge of those elements of credibility spontaneously revealed by the witness' demeanor in the course of his testimony before a trier of facts.

This is not the time to make a critical examination of that small specimen of the expressive indicia which presumably are a part of the sagacity of a trier of facts. With the knowledge of applied psychology which we now have, we know it is highly improbable to observe, during such a brief period and under such impracticable circumstances as are met in a trial on the facts, the moral demeanor of a witness. Let us disregard for the time being the ingenuous specimen of the expressive indicia learned by experience by a trier of facts in arriving at the truth through that curious plastic revelation of the credibility which is presumably reflected on the human figure. I confess that my ten years' experience as a trier of fact has created in my mind great doubt on the effectiveness of the method. For a critique on demeanor

evidence, see *National Labor Relations Board* v. *Dinion Coil Co.*, 201 F. 2d 484, 487–490, (Frank, 1952).

Following the civil jury practice or the practice of equity, it was for a long time a fairly acceptable rule for the appellate and reviewing courts that if there was sufficient evidence in the transcript of the oral testimony as to the trial judge's finding, appellate or reviewing courts would not disturb such finding. We need but ponder awhile to realize the absurdity that might result in judicial practice in superimposing the rudimentary perception of the expressive elements of credibility upon the reasoned concept of the logical elements of credibility.

The inclusion in Rule 52 (a) of the Federal Rules of Civil Procedure of the new provision that findings of fact based on oral testimony would be set aside if clearly erroneous, gave the progressive courts an opportunity to formulate a new rule of judicial practice in the sense that the finding made by the trial judge shall not prevail, although it was supported by sufficient evidence, *if such finding of fact did not represent the more rational, fair, and juridical balance of the entire evidence*. As stated in the words of Stanley Reed, learned Justice of the Supreme Court of the United States: "A finding is 'clearly erroneous' *when* although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." (*United States* v. *Gypsum Co.*, 333 U. S. 364, 395; 92 L. Ed. 746, 766, (Reed, 1948). Contrary to the supposition that this interpretation by the Supreme Court of the United States was due to unusual circumstances which did not interfere at all with the old practice of conclusiveness, it has become the general rule in all those cases where the trial judge's findings conflict with the more rational, fair, and juridical balance of the entire evidence (the weight of the evidence). *Arnolt Corp.* v. *Stansen Corp.*, 189 F. 2d 5, 9, (Finnegan, 1951) ; *Smith* v. *Manning*, 189 F. 2d 345, 349, (Kalodner, 1951) ; *Gindorff*

64

v. *Prince*, 189 F. 2d 897, 898, (Clark, 1951) ; *Pennsylvania Threshermann & Farmers Mut. Cas. Ins. Co.* v. *Grapet*, 199 F. 2d 850, 853, (Rives, 1952) ; *Sturm* v. *Washington Nat. Ins. Co.*, 208 F. 2d 97, 102, (Gardner, Nov. 1953) ; *Salaky* v. *The Atlas Barge No. 3*, 208 F. 2d 174, 175, (Clark, Nov. 1953) ; *Home Indemnity Co. of New York* v. *Standard Acc. Ins. Co.*, 167 F. 2d 919, 923, (Garrecht, 1948) ; *State Farm Mut. Automobile Ins. Co.* v. *Bonacci*, 111 F. 2d 412, 415, (Gardner, 1940).

When the evidence consists not only of oral testimony but also of public or private documents, judicial depositions of absent witnesses, written or oral stipulations of admitted facts, or facts uncontroverted by the allegations or the evidence, the rule of conclusiveness applies exclusively to oral testimony given in the presence of the trier of facts, but not to the balance of the evidence, in the belief that the appellate or reviewing courts are as able as the trial court to evaluate the balance of the evidence. Thus, the rule of conclusiveness was limited exclusively to that portion of the oral testimony which bears out an irreconcilable conflict, although rationally probable, between two contradictory theories on an essential fact which cannot be settled by any other portion of the evidence, or which to be settled requires those elements expressive of the credibility which the observation of the witness in the course of his testimony affords to the conviction of the trier. *Wigginton* v. *Order of United Commercial Travelers*, 126 F. 2d 659, 661, (Minton, 1942), (stipulated facts) ; *Johnson* v. *Griffiths S. S. Co.*, 150 F. 2d 224, 225, (Garrecht, 1945), (depositions) ; *Kuhn* v. *Princess Lida of Thurn & Taxis*, 19 F. 2d 704, 706, (Jones, 1941), (uncontroverted facts) ; *Carter Oil Co.* v. *McQuigg*, 112 F. 2d 275, 279, (Evans, 1940), (documents) ; *Equitable Life Assur. Soc.* v. *Irelan*, 123 F. 2d 462, 464, (Healy, 1941), (depositions) ; *Fleming* v. *Palmer*, 123 F. 2d 749, 751, (Mahoney, 1941), (documents). It is clear that in those cases where the supremacy of the oral evidence is manifest

and the conflict between the irreconcilable testimonies has been settled by the judge, accepting the theory of one of the parties, the rule of conclusiveness applies without any reservation, unless it is contrary to the natural order of things, or to the rational order of human intelligence. See, for example, *Gindorff* v. *Prince, supra;* as to the conjectural scope of the finding, *Hunter* v. *Dowd,* 198 F. 2d 13, 17, (Lindley, 1952) ; as to the appropriate judicial attitude towards improbabilities, *Old Colony Bondholders* v. *New York, N. H. & H. R. Co.,* 161 F. 2d 413, 443, (Frank, dissenting, 1947).

The theoretical impossibility of separating completely the questions of fact and of law in those mixed findings of fact and conclusions of law, has in turn created the need for distinguishing between purely testimonial inferences and secondary or derivative inferences from purely testimonial inferences. If the finding is sufficient to induce to another finding, the appellate or reviewing court must not disturb it. However, if from the finding, or from the finding directly drawn from the fact finding, the trial judge draws other inferences or conclusions having no factual character, properly speaking, but a juridical character, the second inference drawn from the evaluation of the facts is regarded as a conclusion of law, which is always subject to review and reversal by the appellate or reviewing court. *Kuhn* v. *Princess Lida of Thurn & Taxis,* 119 F. 2d 704, 705, 706, (Jones, 1941) ; *E. F. Drew & Co.* v. *Reinhard,* 170 F. 2d 679, 683, 684, (Learned Hand, 1948) ; *American Tobacco Co.* v. *The Katingo Hadjipatera,* 194 F. 2d 449, 451, (Frank, 1951) ; *Ball* v. *Paramount Pictures,* 169 F. 2d 317, 318, (McLaughlin, 1948) ; *Orvis* v. *Higgins,* 180 F. 2d 537, 538, 539, 540, (Frank, 1950).

Summing up, the trial judge's findings will be sustained where, upon examination of the entire evidence, they constitute the more rational, fair, and juridical balance of the evidence and do not contravene the natural order of things nor the rational order of human intelligence. Any deduc-

tion or inference from a finding, which does not represent a deduction or inference from such finding, but the application of a legal principle, a logical reasoning, or a juridical opinion to a finding, or to the fact deduced or drawn from the finding, will be regarded as a conclusion of law subject to review and reversal by the appellate or reviewing court.

Upon considering the transcript of the evidence as a whole, it is clear that the finding of fact or conclusion of law, or the mixed finding of fact and conclusion of law, that the contract between appellee and appellant was one of consignment, although there is sufficient evidence in the transcript of the evidence to support it, does not represent the more rational, fair, and juridical balance of the entire evidence. Upon re-examination of the trial court's finding of fact No. 4 as well as the conclusion of law, we are not convinced that it was the trial judge's opinion that the juridical relation between appellee and appellant was one of the special commercial commission for purposes of sale, whereby the consigned merchandise was for the account of the principal for future operations. In the first place, the agreement between the parties was for a price per unit and not a commission, the latter being a characteristic feature of a commercial commission. In the second place, the disposal of the merchandise was not subject to instructions from the principal, appellant being at liberty to dispose of it for his own benefit (*lucri causa*). In the third place, there is an undisputed fact, which partakes of the nature of an admission, which appears spontaneously from the evidence and which constitutes the clue to the real juridical relation between the parties: Before the cartons of canned juice left Puerto Rico for New York, Crescioni had sold the entire shipment to a Puerto Rican dealer in New York, one Ángel Víctor Albandoz, who in turn, at least with respect to the first shipment of 1,000 cartons, sold it to different New York retailers. As a question of fact, it was Albandoz and not Crescioni, appellant herein, who received the merchandise at

the pier in New York. There is no question that Crescioni sells to Albandoz directly, in his name and not in the principal's, wherefore we must rule out the possibility of the commercial agency contract, or of the feature of the commercial commission whereby the principal is directly bound to those parties with whom the agent has contracted. There is no question that the re-selling price to Albandoz is fixed by Crescioni, for his own benefit, and not by the principal, wherefore we must rule out the possibility of a commercial commission, wherein the unbending rule is that the commission merchant can not sell for his own benefit, nor for the benefit of any person other than the principal, the merchandise which is the object of the commission. If full credence is placed on appellant's theory on the class of contract involved, which is the same as that believed by the trial court —"to pay as soon as it is sold" (Tr. Ev. 45)—we must necessarily conclude that the transaction between appellee Julián R. Rivera and appellant Francisco A. Crescioni was a commercial sale once the merchandise was removed by Albandoz from the New York pier, since any mercantile operation between merchants characterized by "resale" and "profit" is a commercial sale. We would at least be dealing with a case where a special commercial commission, for sale purposes, may be converted into a commercial sale between constituent and commercial merchant, under § 188 of the Code of Commerce of Puerto Rico.

The intrinsic content of the juridical transaction must always prevail over the formal aspects of contracts. The annotation of Judgment No. 5 of March 19, 1923 of the Audiencia of Havana, made by the learned doctor of civil and public law, Eduardo Rafael Núñez y Núñez, II *Código de Comercio* 374 (ed. by Cultural S. A. de la Habana, 1939), provides that, "in line with the authorities, the legal classification of a contract arbitrarily made by the interested parties is not to be taken into account, but, however labelled, the contract must be classified in the light of the applicable

legal precepts, bearing in mind its nature and in each case the terms and stipulations therein embodied, revealing the intention of the contracting parties . . ."

As to the disposal of the damaged merchandise by reason of defect, under § 254 of the Code of Commerce of Puerto Rico related to § 1247 of the Civil Code of Puerto Rico, it was the duty of the purchaser under a contract of sale to return the damaged or deteriorated article before rescinding the contract. 1 *Curso de Derecho Mercantil* 249, Pablo González Huebra (ed. by Librería Sánchez, 1867). We share the trial court's view that, regardless of the nature of the contract involved, appellant had no right to dispose of the damaged merchandise in any manner which might be prejudicial to appellee, without a previous administrative confiscation or judicial declaration.

By the same token, if appellee wished to recover payment for the 600 cartons returned by the purchaser, he should have deposited in court the merchandise subject to the court's determination whether the return was unjustified, pursuant to § 250 of the Code of Commerce of Puerto Rico related to § 257 of the same Code. *Código de Comercio Español*, Gay de Montellá (ed. cit.), Vol. III(1), pp. 188–190; *Manual de Derecho Mercantil*, Lorenzo Benito (ed. by Victoriano Suárez of Madrid, 1929), Vol. II, pp. 313 *et seq.;* *Comentarios a la Ley de Enjuiciamiento Civil Reformada*, José María Manresa y Navarro (ed. by Imprenta de la Revista de Legislación, 1895), Vol. IV, p. 526.

I feel constrained to conclude that as soon as the merchandise is delivered in the New York pier, the transaction between the parties is actually a commercial sale, by our duty to apply § 259 of the Code of Commerce of Puerto Rico, which provides: "Delay in payment for the article purchased shall obligate the purchaser to pay the legal rate of interest on the amount he owes the vendor," from the time the merchandise is placed at the purchaser's disposal, or when such merchandise is judicially deposited in the event of the pur-

chaser's refusal to receive it. According to the learned Spanish commentator, José María González de Echávarri y Vivanco, III *Comentarios al Código de Comercio y Jurisprudencia Española* 456 (ed. by Imprenta y Librería de Casa San Martín, 1945): "The justification for this precept is found in the titles of *lucrum cessans* and *damnum emergens* to which the delay or default is reduced, since the vendor to whom the purchaser fails to pay the price forfeits the precious and negotiable use of the money which is the amount of the price." As a question of fact, even if we were concerned with a commercial commission, in the event of delay in returning to the principal the balance of the amounts, after deducting his commission, he would have to pay the same legal rate of interest. Section 181 of the Code of Commerce of Puerto Rico. In this connection, the fact that the point involved was not assigned as error or was not specifically raised on appeal, should be no bar.

Regarding the fact that the noninclusion of the interest was not specifically assigned as an error, § 1 of "An Act Establishing the Supreme Court of Puerto Rico as a court of appeals," approved March 12, 1903—Code of Civil Procedure of Puerto Rico, p. 292 (ed. by Bureau of Supplies, Printing and Transportation, 1933)—which provides: "That the Supreme Court of Puerto Rico shall hereafter, be a court of appeals and not a court of cassation. In its deliberations and decisions, in all cases, *civil or criminal*, said court shall *not be confined* to the errors in proceeding (procedure) or of law only, *as they are pointed out*, alleged or saved by the respective parties to the suit, or as set fourth (forth) in their briefs and exceptions, *but in furtherance of justice, the court may also take cognizance of all the facts and proceedings in the case as they appear in the record*, and likewise consider the merits thereof, so as to promote justice and right and *to prevent injustice and delay*," vests this Court with sufficient power to take cognizance of any error committed by a trial judge as disclosed by the record of the case, even

though such error was not assigned by any of the parties. *Penne González v. De la Guerra*, 46 P.R.R. 256, 257, (Del Toro, 1934) ; *Rivera v. Heirs of Lugo*, 42 P.R.R. 183, 187, (Texidor, 1931) ; *National City Bank of N. Y. v. Martínez*, 41 P.R.R. 162, 170, (Texidor, 1930) ; 2 Cal. Jur. 729, § 420 (ed. by Bancroft Whitney Co. of San Francisco, 1921) ; 4 Cal. Jur. (2d) 317, § 483 (ed. by Bancroft Whitney Co. of San Francisco, 1952).

As to the fact that the point involved was not expressly raised on appeal, where the error consists of improper application of the law the appellate or reviewing courts have power to correct motu proprio errors in the application of the law. *Castro v. Payco Inc.*, 75 P.R.R. 59, 71, (Marrero, 1953) ; *Rodríguez v. Martínez*, 68 P.R.R. 417, 422, (De Jesús, 1948) ; *Concepción v. Latoni*, 63 P.R.R. 666, 668, (Travieso, 1944).

I dissent.