In the Matter of the Complaint of **MORAN INLAND WATERWAYS CORPORATION**, as owner, and Moran Towing & Transportation Co., Inc., as chartered owner of **TUG MARGOT MORAN**, for exoneration from or limitation of liability.

In the Matter of the Complaint of **SEABOARD SHIPPING CORPORATION**, as owner of the **BARGE OIL TRANSFER 32**, for exoneration from or limitation of liability.

Nos. 67 Civ. 967, 67 Civ. 2511.

United States District Court,
S. D. New York.

Oct. 30, 1970.

Burlingham, Underwood, Wright, White & Lord, New York City, for plaintiff; Eugene Underwood, Robert B. Pohl, Frank L. Wiswall, Jr., New York City, of counsel.

Purdy, Lamb & Catoggio, New York City, for defendant; Vincent A. Catoggio, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

In early November, 1966 Arthur Naess and Charles Thompson, two

bargemen, were lost from the barge Oil Transfer 32 (O.T. 32) during an extremely severe storm while the barge was under tow by the tug Margot Moran (Margot) on Lake Michigan. Moran Inland Waterways Corporation was the owner and Moran Towing and Transportation Co., Inc. the bareboat chartered owner of the tug Margot. (These corporations will be referred to as Moran.) Seaboard Shipping Corporation (Seaboard) was the owner and operator of the O.T. 32.[1] Claims were made against Moran and against Seaboard for the two deaths and Seaboard made claim against Moran for damage sustained by the O.T. 32. Seaboard and Moran then each filed a separate proceeding in admiralty for exoneration from or limitation of liability.

Claims to recover for the deaths were made in both limitation proceedings on behalf of the wives of Naess and Thompson. Subsequently, Moran and Seaboard entered into a joint settlement with the death claimants pursuant to which each advanced a portion of the $225,000 paid in settlement. The agreement provided:

  6. In the event that Seaboard is held liable to Moran, Moran shall be entitled to include in its damages the sum which it will advance to settle the death claims, and in the event that Moran is held liable to Seaboard, Seaboard shall be entitled to include in its damages the sum which it will advance to settle the death claims.

  7. Neither Moran nor Seaboard shall be required to prove its liability to the death claimants or any justification, legal or otherwise, for the settlement with the death claimants as a condition precedent to obtaining indemnity from the other.

Under these provisions Moran seeks to recover from Seaboard by way of indemnity the amount it contributed to settle the death claims. In the alternative, it seeks contribution from Seaboard.

Seaboard, on the other hand, seeks to recover from Moran the amount it contributed to the settlement of the death claims. It also claims damages in the sum of $55,000 allegedly sustained by the O.T. 32. In any event, Seaboard seeks to limit its liability in order to fend off any recovery against it by Moran.

The issues thus presented were tried before me without a jury.

The O.T. 32 is a steel tank barge, 1278 gross and net tons, 229.4' long by 42.9' wide by 14.5' deep. She had no propulsion power but carried a crew of two certified tankermen. On October 30, 1966 she loaded a cargo of benzoil at Lemont, Illinois for Bay City, Michigan. On the morning of October 31, 1966, the O.T. 32 was pushed from Lemont to Chicago by the tug Margot on the first leg of the voyage. The Margot is a steel tug 141 gross tons, 96 net tons, 84.8' long by 24' beam by 9.6' depth with 1280 h. p. diesel engines. She carried a crew of 7 including Chester MacDonald, her Captain. The officers of the tug and the crews of both tow and the tug were thoroughly experienced and well qualified. The Margot was equipped with various types of direction finders and weather receiving radio equipment. She did not, however, have a barometer calibrated for the Great Lakes. Seaboard claims that her failure to have a working barometer rendered her unseaworthy.

The O.T. 32 was structurally seaworthy and certified by the Coast Guard. However, its vocaline radio with which to communicate with the tug was and had been out of order for several months. If the bargemen wished to communicate with the tug they had agreed to display a sheet or to use the flood light at night. The barge was also

---

[1]. Both Moran Towing and Seaboard are wholly-owned subsidiaries of Moran Inland Waterways Corporation. Apparently, however, all three are operated independently of one another in all respects.

equipped with a foghorn and flares. None of these devices, however, was an effective means of communication between the two vessels in a severe snow storm.

In addition, the lifeboat on the O.T. 32 had sustained damage in September, 1966 and was unseaworthy. To remedy this an inflatable liferaft had been put aboard the barge at Lemont. The liferaft was an adequate and reasonable substitute for the damaged lifeboat. However, the bargemen were not instructed that proper installation called for the liferaft cannister to be placed on a cradle on the deck near the side of the barge so that it could easily be pushed over the side and inflated. Instead, the liferaft cannister was simply placed within the damaged lifeboat.

At Lemont the O.T. 32 was loaded to drafts of 11'1" forward and aft, her Intermediate Marks giving a freeboard of 3'5". The season for Intermediate Marks expired at 2400 October 31 and at 0001 November 1 the winter season commenced during which her maximum permissible drafts were 2¾" less than the Intermediate Marks.

The trip from Lemont to Chicago was uneventful and the flotilla arrived there on the afternoon of October 31. Gale warnings for Lake Michigan remained up throughout that day. This prompted Captain MacDonald to remain at Chicago rather than to set out immediately. The next morning, although gale warnings were still in effect, the actual weather conditions at Chicago, as well as at Milwaukee, 75 miles up the west shore of the Lake, were quite moderate. With winds coming from the northwest, MacDonald determined that there would be no risk as long as he remained in the lee of the west shore. Before leaving Chicago, at 0830 on November 1, he informed the bargemen aboard the O.T. 32 that the weather would be a little sloppy and while he did not tell them that gale warnings were in effect, the gale flag was up at the Coast Guard dock in plain view. In view of the fact that Captain MacDonald could reasonably have expected the winds to continue from the northwest, it was not unreasonable for him to set out in the face of gale warnings and he was not negligent in so doing.

At 0830 on November 1, the Margot pushed the O.T. 32 onto Lake Michigan and there took her in tow on a 1200 foot hawser. The crew of the O.T. 32 consisted of Barge Captain Naess and Mate Thompson.

At 1800 on November 1, while the flotilla was traveling north along the west shore of the Lake, gale warnings were lowered and small craft warnings were raised. The forecast continued to call for northwest winds. Intermittent heavy snow fell during the afternoon and evening of November 1. Seas increased and the speed of the tug was reduced.

At 0230 November 2, the Margot received a report from Point Betsie on the east shore of the Lake of winds NNE. At 0930 on November 2, when the flotilla was 11 miles off Sheboygan on the west shore, the winds had actually shifted to the northeast with velocities of 20–25 MPH. Small craft warnings were still in effect. In order to seek the lee on the east shore and so that the flotilla would head into the weather and seas, MacDonald changed course and headed northeasterly across the Lake toward Big Sable Point, 60 miles away on the east shore. Before heading across the Lake at 0930 on November 2, the tug could safely have put in at Sheboygan if MacDonald had thought it necessary. It was not, however, unreasonable under the circumstances to change course and head across the Lake and it was not negligent to do so. At 1200 November 2 the forecast was for northeasterly winds with snow, and small craft warnings were up.

At 1330 on November 2, four hours after the flotilla had shifted course at Sheboygan and headed across the Lake toward Big Sable Point, a special weather bulletin was broadcast for the portion of the Lake in which the flotilla was then located, changing small craft warnings to gale warnings at 1500 hours.

Winds were still from the northeast and no shift to the northwest was forecast or anticipated at that time. The O.T. 32 had consistently appeared to be riding well and there was no reason to be apprehensive about her safety. Thus, MacDonald continued across the Lake to seek the lee on the east shore. While it was possible to turn back at 1330, MacDonald's decision to proceed across the Lake was not unreasonable and his failure to turn back was not negligent.

At 1800 on November 2 the forecast was for winds N 41–47 knots for 12 hours, shifting to NW in the following 12 hours. The cabin lights of the barge were visible. There is no evidence that it was possible at this point to return the flotilla to the west shore and Seaboard makes no such claim.

At 0000 November 3, the forecast was for winds N 41–47 knots for 9 hours, shifting to NW during the succeeding 9 hours, then NW 28–33 knots for the following 6 hours, with snow or rain and snow. The flotilla continued to experience northeasterly winds and seas. It proceeded without apparent difficulty toward Big Sable Point. At daybreak the cabin lights of the barge were burning.

At 0600 on November 3, when the tow was 10 miles from Big Sable Point on the east shore of the Lake, the winds shifted to the northwest. Because of the nature of the available harbors on Lake Michigan, it was unlikely that, under the existing weather conditions, the tug could have brought the barge on a 1200-foot hawser safely into a harbor on the east shore. Moreover, it would have been unsafe to shorten the hawser under the circumstances. Thus, the only reasonable alternative available to Captain MacDonald was to change course and head into the winds and seas toward the west shore of the Lake. This is what he did at 0600 on November 3.

At about 0700 on November 3, the O.T. 32 was observed, through lulls in the snow, to be riding and following well. No distress signals from her crew were seen. However, the lifeboat of the barge was observed to be athwartship instead of in its regular fore and aft position. The Margot was proceeding at reduced speed and was in no difficulty.

At mid-afternoon of November 3, the storm increased to peak intensity with winds of about 50 knots, gusting to 65 knots, and seas of about 15 feet. At this point, the Margot had no alternative but to proceed as best she could, heading northwesterly into the weather and seas so as to minimize the effect of the winds and seas on the flotilla.

At 1530 on November 3, the O.T. 32's liferaft was found, fully inflated, floating ashore at Big Sable Point. No one was aboard the liferaft. Of course, this was not known to the Margot and her crew at the time.

At 1800, on November 3, gale winds for some 15 hours were still indicated. At 1830 hours, however, the snow stopped. The flotilla was then 20 miles WSW of Point Betsie Light on the west shore of the Lake. No lights were visible on the barge. However, those on the tug assumed that the lights in the cabin were out because the bargemen were asleep. The flotilla continued into slowly diminishing northwesterly seas at an increased speed so as to arrive off the west shore of the Lake at daybreak.

At 0600 on November 4, when the flotilla was some 14 miles from Cana Island, gale warnings were lowered and small craft warnings were raised. When it became light it was observed that the bow of the O.T. 32 was riding high. It was still too rough to shorten the hawser or to get alongside the barge. However, at 0800 the hawser was hauled and the mate of the tug boarded the barge.

He found that the aft deck was awash about 1′ at its lowest point just forward of the cabin. Though the horizontal door of the cabin was tightly closed, the vertical door was ajar about 1″. Both cabin doors opened aft. The cabin was filled with water to the sill. The lifeboat and liferaft were missing. The deck

was in a shambles with a broken port boom, cargo hoses hanging over the side, cowl ventilators missing and pump and engine rooms flooded. The two bargemen were missing.

From 0600 November 3 to 0800 November 4, weather and sea conditions were such that the tug could not have put the flotilla into an east shore port, nor could it have attempted to go back alongside the barge or draw off to one side for a clear look at her, because of the danger of both tug and barge broaching.

When the mate reported the results of his inspection, the tug notified the Coast Guard and proceeded to Sturgeon Bay. There the O.T. 32's pump room, engine room and cabin were pumped out. There was no damage to her hull or her cargo which was later outturned intact after she had been towed to Bay City, Michigan on November 7.

The body of Captain Naess was found on the beach at Glenhaven, Michigan, on the east shore of the Lake on November 20, 1966. He had died from drowning.

The body of Mate Thompson was never found.

#### The Liability of Moran

■■ In South, Inc. v. Moran Towing and Transportation Co., 360 F.2d 1002 (2d Cir. 1966), the Court of Appeals of this Circuit recently restated the principles upon which the liability of a tug to its tow is based:

> The fact that the tow appeared to be in good order when delivered to the Tug and yet suffered damage before reaching its destination does not in itself raise a presumption of negligence; and this is so even where the tow was * * * unmanned. Neither the Tug nor its owner is a bailee

or an insurer. Stevens v. The White City, 285 U.S. 195, 200–201, 52 S.Ct. 347, 76 L.Ed. 699 (1932). In that case the Supreme Court said, at page 201, 52 S.Ct. at page 349:

> "It has long been settled that suit by the owner of a tow against her tug to recover for an injury to the two caused by negligence on the part of the tug is ex delicto and not ex contractu." * * *

> * * * * * *

> The White City case also holds that the burden of proof in showing negligence on the part of the tug rests upon the libellant tow throughout trial; * * *

360 F.2d at 1005 [2]

■ Moreover, a tug captain is guilty of negligence only upon a showing of his failure "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar services." Stevens v. The White City, supra, 285 U.S. at 202, 52 S.Ct. at 350; M. P. Howlett, Inc. v. Tug Michael Moran, 425 F.2d 619 (2d Cir. 1970). The Court of Appeals has recently cautioned that in determining this question the trier of the facts may not employ the luxury of hindsight. "In faulting the master of a tug for choosing one course of action over others that may have been available in situations requiring judgment under conditions of abnormal stress, we must be careful to 'judge the conduct of the master of a vessel in the light of the circumstances which he faced at that time * * * and not as they may have appeared to one looking back at them several hours or days later.' Esso Standard Oil, S. A. v. S. S. Gasbras Sul, 387 F.2d 573, 582 (2d Cir. 1968)." M. P. Howlett, Inc. v. Tug Michael Moran, supra.

2. Relying on James McWilliams Blue Line, Inc. v. Esso Standard Oil Company, 245 F.2d 84 (2d Cir. 1957) and Dunbar v. Henry Dubois' Sons Co. Inc., 275 F.2d 304 (2d Cir. 1960) Seaboard contends that a warranty of workmanlike service runs from a tug to its tow. While those cases seem to establish such a doctrine, the warranty is certainly not tantamount to absolute liability and plainly does not affect the principle that a tug is not liable to its tow in the absence of negligence.

■ Applying these principles to the case at bar, it is apparent that Captain MacDonald's conduct under all the circumstances was not unreasonable and that he was not negligent. Decisions which were reasonable under the circumstances had brought the flotilla to a point 10 miles off the east shore of Lake Michigan at 0600 on November 3. These decisions were based on the actual weather conditions which had been observed and weather conditions predicted by reliable weather stations which the tug received at regular intervals. Furthermore, there was no indication that the barge or her crew were experiencing any difficulty. Visual observations during breaks in the snow indicated that the tow was riding well. During the night of November 2–November 3 the cabin lights were burning and the only abnormal occurrence was the absence of running lights; these, however, had been short circuited by spray on many previous occasions and thus did not cause concern.

When the wind shifted to the northwest, at 0600 on November 3, considerably before this was to be anticipated, MacDonald determined that the risks involved in attempting to bring the flotilla into a harbor on the east shore were greater that those involved in heading back across the lake toward the west shore.

This decision was made in the exercise of MacDonald's best judgment as an experienced tug captain and in the light of the conditions and circumstances as they existed at the time. Plainly, the cause of the unfortunate loss of the two bargemen was the extremely violent winds and seas which were encountered during the final northwesterly leg of the voyage. But it has not been shown by the evidence that MacDonald's decision to cross the lake to the northwest, in the light of the circumstances which he faced at the time, so departed from standards of prudent seamanship or was so unreasonable as to constitute negligence.

Seaboard's contention that the failure of the Margot to have a working barometer, calibrated to the Great Lakes, was negligence which caused the loss is without support in the record. There is nothing to show that if the barometer had been working properly it would have enabled MacDonald to forecast the critical and unexpected shifts in the wind any better than he was able to do with the periodic and regular reports he was receiving from shore weather stations employing highly sophisticated forecasting equipment, or would have been a factor in the decisions which he made. The fact that these forecasters were unable to predict accurately the conditions which, in fact, developed indicates that it was the unusual course of the storm and not the failure to have a working barometer aboard the tug which caused the flotilla to be on Lake Michigan when the storm peaked.

Nor has Seaboard adduced any evidence to support its contention that the failure of the Margot to notify the Coast Guard of the flotilla's situation when it was off the east shore of the Lake constituted negligence which caused the loss. There is nothing to show that the Coast Guard had any means by which to aid the flotilla in gaining entrance to a safe harbor on the east shore. And it has not been shown that the failure to alert the Coast Guard as the storm increased in intensity contributed to the tragedy which took place.

■ I find that it has not been established by a preponderance of the evidence that Moran was guilty of any negligence which caused the loss of Naess and Thompson. Accordingly, Seaboard may not recover from Moran by way of indemnity or contribution the amount or any part of the amount Seaboard paid out in settlement of the death claims or the damages sustained by the O.T. 32 as a result of the storm.

### The Liability of Seaboard

■ For its own part, Moran seeks to recover from Seaboard the amount it

contributed to settle the death claims. It contends that pursuant to the settlement agreement it may recover its contribution because the loss of Naess and Thompson was caused in whole or in part by Seaboard's negligence or by the unseaworthiness of the O.T. 32 on its departure from Chicago and during the voyage.

> It is * * * settled that the owner of a tow is responsible for its seaworthiness and warrants that she is " * * * sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage." The Edmund L. Levy, 128 F. 683, at 684 (2d Cir. 1904); Frederick Snare Corp. v. Moran Towing & Transportation Co., * * * [195 F.Supp. 639, 644 (S.D.N.Y.1961)].

South, Inc. v. Moran Towing & Transportation Co., supra at 1005. And if damage results to the tug from a failure of the tow to render itself seaworthy, the tug may recover therefor. South, Inc. v. Moran Towing & Transportation Co., supra.

Moran claims that the O.T. 32 was unseaworthy in that (1) the barge crew failed to lash the cargo hoses and booms; (2) they failed to secure the hatches and turn the ventilators facing aft; (3) Seaboard failed to supply the barge with an operable radio which could communicate with the tug; (4) Seaboard failed to supply a seaworthy lifeboat and failed to instruct the bargemen on the proper installation of a liferaft; and (5) the barge was loaded below her permissible draft for the winter season which commenced during the voyage. Moran contends that it was the unseaworthiness of the barge, the negligence of Seaboard in failing to see that the barge was properly equipped, and the negligent failure of the barge crew to correct the unseaworthy conditions aboard her which caused the deaths.

The key aspects of this case concern what caused Naess and Thompson to leave the cabin of the O.T. 32 and go on deck and what happened to them when they did. Such questions as whether they then attempted to leave the O.T. 32 intentionally, whether they succeeded in so doing and were lost later, or whether they were swept or knocked overboard, are vital. No one observed what occurred and the record is devoid of direct evidence on these questions.

Relying primarily on the conditions observed aboard the barge when the loss of the bargemen was discovered, and the overall surrounding circumstances, the parties have each attempted to reconstruct the chain of events which brought about the two deaths according to the theories which best support their respective claims with respect to liability.

The evidence indicates, and the parties apparently agree, that the men were lost sometime during the morning or early afternoon of November 3. It appears that when the loss was discovered the aft portion of the deck of the barge was awash about one foot at its lowest point just forward of the cabin. Both sides of the engine room were filled with water, although the watertight door which separates the port and starboard sides was closed. The after cover of the starboard engine room was open 12 to 18 inches, held in that position by a line caught in its hinges. Both covers of the port engine room hatch were closed and dogged. The cowls on both port and starboard engine room ventilators were missing.

The pump room was also filled with water. The after cover of the starboard pump room hatch was closed but not dogged. Apparently, the other three covers on the pump room hatches were closed and dogged. The cowl ventilator on the port side of the pump room was in place, facing forward. The cowl ventilator on the starboard side of the pump room was missing.

The cabin of the barge, the doors of which faced aft, was also flooded. The manhole cover on the floor of the cabin leading to the pump room below was open. Most of the equipment in the cabin was destroyed but the two mattresses were missing. The 2½ foot galley smokestack was missing. The 5 foot

galley smokestack was in its storage bracket. The vertical portion of the cabin door was ajar about 1 foot.

There was no trace of lashings in any of the lashing eyelets on the cradles for the four cargo hoses or in the lashing eyelets of the boom cradles. The two starboard cargo hoses and the starboard boom were hanging over the starboard side. The two port cargo hoses were also out of place and the port boom was broken.

The lifeboat was missing and was never recovered. The liferaft was found fully inflated but empty, floating ashore at Big Sable Point, at 1530 on November 3.

When the body of Arthur Naess was found on the east shore of Lake Michigan on November 20, 1966, he was dressed in full heavy-weather gear, including rubber parka with hood, rubber trousers and lifejacket. His glasses were on. The only markings on the body were abrasions and contusions on the skin of both legs. As has been indicated, the body of James Thompson was never found.

Based on these facts, Moran advances the following theory as to how the two bargemen were lost:

Upon leaving Chicago and thereafter, the bargemen failed to lash the hoses and booms, to secure the hatches, and to turn the ventilator cowls aft. When the storm intensified on November 3, water entered the engine and pump rooms through the unsecured hatches and the ventilator cowls which faced forward. The hoses and booms which had not been lashed, thrashed around on the deck. At some point the bargemen dressed in their heavy-weather gear and left the cabin to correct the situation on deck. They took their mattresses with them to cover the pump room ventilator cowls which under the weather conditions could not be turned aft. They left the vertical cabin door undogged so that they could re-enter the cabin more easily. Once on deck they were struck by or tripped over the unsecured hoses and

were washed or knocked overboard. Later, the cabin filled with water which entered through the open vertical door. The engine and pump rooms became flooded, the aft portion of the barge lost buoyancy and the seas came over the stern and carried away the ventilator cowls.

According to the Moran theory, the liferaft was released from the lifeboat when the latter was damaged by the unsecured cargo hose. The liferaft then became inflated by itself when its trip line caught on a broken portion of the lifeboat. When inflated it was blown overboard and drifted to Big Sable Point.

■ As Moran points out, the element of causation may be proved by circumstantial evidence. Johnson v. Griffiths S. S. Co., 150 F.2d 224 (9th Cir. 1945). Moreover, in the absence of direct evidence, a showing that the accident more probably occurred in one way than another, if supported by a fair preponderance of the credible evidence and the reasonable inferences to be drawn therefrom, may be sufficient to *support* a finding that the accident occurred in the more probable way. See The Black Diamond, 273 F. 811, 812 (2d Cir. 1921); The Wineco, The J. G. Reichert, The Mary E. Reilly, 39 F.2d 970 (E.D. N.Y.1921). It is clear, however, that the existence of mere probabilities in no way *compels* such a finding where other reasonable inferences may be drawn. Cf. Schulz v. Pennsylvania R. Co., 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956); Reck v. Pacific-Atlantic S. S. Co., 180 F.2d 866 (2d Cir. 1950); Casey v. American Export Lines, 173 F.2d 324 (2d Cir. 1949).

■ In the case at bar Moran has failed to establish even the probability that the deaths occurred in the manner suggested by its theory, much less that there are no other inferences to be drawn. Thus, while it is not impossible for the bargemen to have been lost in the way Moran claims, it is plain that Moran's theory is based almost entirely on pure speculation.

Such evidence as there is before me (and it is little enough) tends to indicate that the deaths did not occur in the manner suggested by the Moran theory and were not brought about by the negligence of Seaboard or unseaworthy conditions aboard the O.T. 32.

It seems highly unlikely that the liferaft became inflated by itself and was not inflated by the bargemen. It may well have been that when Naess and Thompson donned their full heavy-weather gear and left the cabin for the last time, their purpose was to inflate the liferaft in preparation for leaving the barge. In a storm as severe as this one, it is unlikely that the bargemen would have left a secure cabin unless the cabin was filling with water and they had no alternative but to do so. In fact, they may have believed that the barge was in imminent danger of sinking.

There is no doubt that the storm was extraordinarily violent. One witness testified it was the worst he had seen in twenty years on the Lakes. The winds and seas pounded the barge with terrific force and the bow light brackets, the running light box and its stanchion had been twisted and distorted by the pounding. The ventilator cowls may well have been blown or washed away by the action of wind and wave, thus allowing the engine and pump rooms to become flooded and causing the barge to settle at the stern. Apparently the small galley smokestack was blown away and it may have been through that aperture that water poured into the cabin. Indeed there is testimony that some water had come through the smokestack on previous occasions. There is nothing in the record, however, to indicate that the large galley smokestack, which Moran claims should have been used, would have fared any better. The hatch from the cabin to the pump room may have been opened by the bargemen in order to let water drain from the cabin. If so, because of the flooding of the pump room, the effort to drain the cabin would have been unsuccessful.

Such probabilities as there are suggest that substantial flooding in the cabin forced the men to leave it and, in the absence of another safe place on the barge, to attempt to leave the barge. In such circumstances, it is probable that they inflated the liferaft, put it over the side and attempted to board it. It may well have been that they were unsuccessful in that attempt and that it was there that they were lost.

All this, of course, is speculation also. Whatever theory may be advanced is full of difficulties. It will serve no useful purpose to pile speculation upon speculation. It is enough to say Moran has failed to sustain its theory by a fair preponderance of the credible evidence and thus has failed to establish that the failure to secure the cargo hoses, booms and hatches and to position the ventilator cowls properly was a contributing factor in bringing about the deaths of Naess and Thompson.

The same can be said of the incorrect positioning of the liferaft in the lifeboat and the fact that the lifeboat was unseaworthy. The liferaft was entirely seaworthy and quite as adequate as the lifeboat for use in an emergency. The liferaft was inflated and over the side and this may well have been done by the two bargemen. There has been no showing that the positioning of the liferaft aboard the barge or the unseaworthiness of the lifeboat had anything to do with the deaths.

Moran does not seriously contend that the failure of the barge to have an operable radio with which to communicate with the tug had any causal relationship to the deaths. Indeed, the theory which Moran advances as to how the deaths occurred does not remotely suggest that the absence of a radio had anything to do with what happened. Moran does not make any suggestion that anything could have been done to avoid what occurred had the barge been able to communicate with the tug by radio. Thus, Moran has failed to establish that the absence of a radio was a cause of or contributed to the tragedy.

Finally, even assuming that the loading of the barge at a date when intermediate marks were still applicable, 2¾″ below her permissible marks for the winter season which commenced during the voyage, was improper, Moran has made no showing that this was a cause of or contributed to what occurred.

I find that Moran has failed to prove by a fair preponderance of the credible evidence that the deaths of Naess and Thompson were caused by the unseaworthiness of the barge or the negligence of Seaboard or the bargemen, themselves. Therefore, Moran may not recover from Seaboard by way of indemnity or contribution the money Moran paid out in settlement of the death claims. Moreover, since Seaboard is not required to respond in damages beyond the amount it has already contributed to settle the death claims, it is unnecessary to decide whether Seaboard is entitled to limit its liability.

Judgment will therefore be entered dismissing both the proceeding of Seaboard and the proceeding of Moran. The foregoing constitute my findings of fact and conclusions of law in this case.

It is so ordered.