**MISSOURI–ILLINOIS BARGE
LINE CO., Plaintiff,**

v.

**HELENA MARINE SERVICE, INC.
and MOTOR VESSEL ROSALEE
GRIMES, her engines, tackle, apparel,
furniture, etc.   .   .   .   In Rem, De-
fendants.**

No. H 73 C–1.

United States District Court,
E. D. Arkansas, E. D.

March 11, 1975.

John Shepherd, of Coburn, Croft,
Shepherd & Herzog, St. Louis, Mo. and
Gordon S. Rather, Jr., of Wright, Lind-
sey & Jennings, Little Rock, Ark., for
plaintiff.

Gene Raff, of Raff & Galloway, Hele-
na, Ark. and John Contois, of Jones,
Walker, Waechter, Poitevent, Carrere &
Denegre, New Orleans, La., for defend-
ants.

## MEMORANDUM OPINION
## AND ORDER

OREN HARRIS, District Judge.

This is an admiralty proceeding with-
in the jurisdiction of this Court pursuant
to 28 U.S.C. § 1333. The plaintiff is a
Delaware corporation with its principal
place of business at Cape Girardeau, Mis-
souri. Plaintiff was the owner of the
motor vessel E. E. Smith, a steel tow-
boat approximately 150 feet long by 34
feet wide, having twin screw diesel pro-
pulsion.

Defendant, Helena Marine Service,
Inc., is an Arkansas corporation having
its principal place of business at Helena,
Arkansas. Defendant was the owner of
the motor vessel Rosalee Grimes, a 53
foot long by 25 foot wide, diesel powered
vessel, and the Barge HMS 103, a 72
foot long by 25 foot wide fuel flat.

On the 26th day of March, 1970, a fire
broke out aboard the E. E. Smith while
the boat was being refueled by employ-
ees of Helena Marine Service, Inc.
aboard the Rosalee Grimes and HMS
103.

The parties have stipulated that the
amounts of damage to the E. E. Smith
resulting from the fire were $215,977.04,
as costs of repairs, and $37,500.00 as loss
of use during repairs.

The matter was tried to the Court,
without the intercession of a jury, begin-
ning on September 30, 1974, and conclud-
ing on October 2, 1974. The parties

were allowed a substantial time to file briefs and to respond to the briefs of the opposing counsel. The Court has carefully reviewed and considered the testimony, the pleadings, stipulations of counsel, depositions, exhibits, briefs and arguments of counsel. This opinion incorporates the Court's findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The motor vessel E. E. Smith was a vessel engaged in interstate commerce upon a navigable waterway of the United States, the lower Mississippi River, on March 26, 1970. The Smith contacted Helena Marine Service, Inc., by radio shortly before arriving at Helena, Arkansas, on that date and ordered delivery of diesel fuel, fresh water, and two drums of Gulf "Dieselmotive 78" lube oil.

The Smith dropped her tow and tied up to the Arkansas shore near Helena. The motor vessel Rosalee Grimes, with fuel flat barge HMS 103 made fast to her bow, was dispatched to deliver the fuel, oil and water to the Smith. The Grimes and HMS 103 were owned by Helena Marine Service, Inc., and crewed by Helena Marine Service employees.

The HMS 103 tied up to the Smith, with her port side to the starboard side of the Smith. Hoses for delivery of the water, diesel fuel, and lube oil were passed from the HMS 103 to the Smith, and pumping of these supplies commenced.

The Smith had two essentially identical lube oil storage tanks located outboard and at the front bulkhead of her lower engine room compartment. The port lube oil tank was made of steel, uninsulated, and had a capacity of some 117 gallons. There was a 1½ inch threaded opening located a few inches down from the top of the tank, to which the Smith's engineer had attached a 2 inch pipe manifold connection, which extended upward through a 4 inch opening in the main deck, just outside the port engine room door. A 1½ inch hole in the concave top of the tank was uncapped to vent air during filling.

A 2 inch hose, consisting of three lengths each about 50 feet long, a total of about 150 feet, connected the filling manifold of the lube oil tank to a gasoline-powered pump on the HMS 103. The pump was mounted on skids. The hose led from the fuel flat through the starboard engine room door of the Smith, across the upper engine room level, through the port engine room door, to the lube oil tank manifold. A considerable length of the hose was coiled around the lube oil pump on the deck of the HMS 103.

The Helena Marine Service employees had loaded two blue and orange drums from their storage area onto the HMS 103 before embarking to meet the Smith. These two drums were supposed to have contained Gulf "Dieselmotive 78" lube oil. The testimony established that it was a common practice at Helena Marine Service to use identical drums for transportation of substances other than lube oil, including gasoline. An inspection after the fire revealed numerous drums with an odor of gasoline, and without distinctive markings.

The two drums were opened and the intake line of the lube oil pump inserted into the first drum, which was pumped empty. The intake line was then removed from the first drum and inserted into the second drum, which was also pumped into the port lube oil tank on the E. E. Smith.

At approximately the same time as the second drum was pumped empty into the lube oil tank, a Smith crewman observed a liquid flowing down the outside of the lube oil tank. There was then a sudden, violent, outbreak of intense fire in the region of the base of the port lube oil tank. Although efforts were made to extinguish the blaze with $CO_2$, the fire burned out of control for several hours, resulting in substantial damage to the Smith.

Upon the outbreak of the fire, the Grimes and the HMS 103 broke loose the diesel fuel hose, the water hose, unmoored, and backed away from the Smith. The lube oil hose was not disconnected. As the Grimes backed away, the lube oil

hose pulled the lube oil pump off the deck of the HMS 103, causing the hose and pump to fall into the river, with the discharge hose end still connected to the lube oil intake manifold on the Smith. The pump apparently fell through the coils of the hose, creating two knots in the lube oil hose.

When the pilot on the Smith attempted to break loose the lube oil hose at the manifold to create room to insert an extinguisher, the fire flashed back into his face.

When the lube oil pump was retrieved by employees of Helena Marine Service, the end of the hose nearest to the lube oil tank had been burned through for several feet, with the charred end nearer the pump being melted and adhering to the deck. It was necessary to break the reinforcing wires and tear the hose loose from the deck to remove it. The hose and pump were removed from the river and taken to the Helena Marine Service dock where they were taken apart and inspected.

Between the charred end of the hose and the first knot, which was tightly drawn, a sample of the contents was taken by employees of Helena Marine Service. The analysis of this sample disclosed the presence of 15% gasoline, 10% heavier petroleum product, and 75% water. Between the pump and the knot, no samples were saved, but the witnesses identified the contents as apparently oil and water, or water with an oily film.

Samples were also taken from the remaining contents of the port lube oil tank and analyzed by experts for both parties. These samples revealed the presence of lead in suspension in the oil residue, with a small fraction of light petroleum product mixed with the lube oil.

From these facts, the Court concludes that there was present in the port lube oil tank of the E. E. Smith a considerable quantity of gasoline, immediately prior to the outbreak of the fire.

Plaintiff contends that the gasoline was pumped into the tank by the HMS 103 from one of the lube oil drums, which, plaintiff alleges, contained gasoline rather than lube oil.

Employees of Helena Marine Service testified that the two drums of Gulf Dieselmotive 78 lube oil in question were removed from the usual and regular place where unopened lube oil drums were stored, that they would have easily noticed the considerable difference in weight between a drum of gasoline and a drum of lube oil, that they checked the refinery seals over the bungs closing off the openings of the drums to make sure the contents were Dieselmotive 78. The Captain of the Rosalee Grimes was quite definite that he personally removed the factory seals on the drums and removed the bungs, that there was no odor of gasoline, but a strong and distinctive odor of lube oil.

The deckhand testified that the pump ran at the normal speed for pumping lube oil, on both barrels, that there was no noticeable difference in pump speed, as would be expected in pumping a much less dense and viscous substance than lube oil, that he personally removed the suction intake pipe of the lube oil pump from the first barrel, that he wiped lube oil from it and would certainly have noticed had the contents been gasoline, that he placed the intake into the second drum and noticed no smell or appearance that would indicate the presence of anything other than lube oil.

When the lube oil pump was dragged overboard, the suction intake was still in the second drum and the Captain and deckhands are quite positive that, when the intake pulled the drum over on its side, the intake left a trail of lube oil, and the drum spilled lube oil on the deck of the HMS 103, which was cleaned up when the fuel flat reached its dock.

On the basis of this testimony, and the fact that the lube oil hose between the knot and the pump did not appear to have contained gasoline, only lube oil and water, and with the testimony of the barge crane operator that, immediately upon the pump being placed on the dock, he personally removed the intake

hose and looked into the pump, and there saw only lube oil and water, with no trace of gasoline, the Court concludes that there was no gasoline in the two lube oil drums in question, and that the defendant's employees did not pump gasoline into the port lube oil tank of the E. E. Smith.

Assuming the presence of gasoline in the port lube oil tank, the addition of two 55 gallon drums of lube oil to the 117 gallon capacity lube oil tank would explain the overflow from the tank observed by the Smith crewman immediately prior to the onset of the fire. The presence of gasoline in the overflow would most readily explain the characteristic sudden, violent ignition of the blaze and the inability of the crew to extinguish the fire with their $CO_2$ equipment. The onset, character, and nature of the fire as described by all witnesses comports with a characteristic gasoline fire as described by the experts who testified.

The undeniable presence of gasoline in the lube oil hose, and the presence of lead in the samples taken from the lube oil tank, are physical facts from which it is possible to infer that gasoline was pumped through the hose into the lube oil tank. However, such an inference is not compelled where other reasonable inferences may be drawn. *In re Moran Inland Waterways Corp.*, 320 F.Supp. 229 (S.D.N.Y.1970) and cases cited therein at p. 237. The Court finds that such an inference in this case would be in direct conflict with a preponderance of the evidence, and is not warranted by the evidence.

The plaintiff contends that the presence of gasoline in the lube oil hose can only be explained by the gasoline having been pumped through the hose into the lube oil tank. Defendant implies that the gasoline was introduced into the hose after the fire. Another possible explanation for the presence of the gasoline in the hose is that it was introduced during the fire by being boiled off from the lube oil tank and condensing in the hose, which was immersed in the cold river water.[1]

The Court finds that the plaintiff has not met its burden of proving by a preponderance of the evidence that the defendant was guilty of any negligence which was a proximate cause of the fire and resulting damages to the Motor Vessel E. E. Smith. The Court specifically finds that the evidence is insufficient to support a finding that defendant's employees pumped gasoline into the port lube oil tank.

It is therefore, considered, ordered and adjudged that the Complaint of the plaintiff herein be and the same is hereby dismissed, with plaintiff to bear the costs of the action. Judgment will be entered accordingly.

---

1. The lube oil tank with a vented top and the attached hose, the hose being immersed in cold water, and heat applied to the bottom and side of the tank, is almost exactly similar to the retort and condenser apparatus and method of distillation described by one of the expert witnesses, a chemistry professor, in explaining how gasoline is separated from heavier petroleum products.